**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

REGINALD ROACH,

        Petitioner,

v.

THE ATTORNEY GENERAL OF THE
STATE OF NEW JERSEY, et al.,

        Respondents.

Civil Action No. 19-21707 (MAS)

**OPINION**

**SHIPP, District Judge**

    This matter comes before the Court on Petitioner Reginald Roach's Petition for a Writ of Habeas Corpus brought pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Following an order to answer, Respondents filed a response to the Petition (ECF No. 17), to which Petitioner replied. (ECF No. 19.) For the following reasons, this Court will deny the Petition, and will deny Petitioner a Certificate of Appealability.

**I.    BACKGROUND**

    In its opinion affirming Petitioner's conviction on direct appeal, the New Jersey Supreme Court summarized the factual background of Petitioner's conviction as follows:

> During the night of November 5, 2005, while sleeping in the second-floor bedroom of her North Brunswick apartment, the victim, H.H. was awoken by a masked man pointing a sharp object at her neck and demanding money. She led him downstairs to a drawer where she kept cash. He took the money and then, while still holding the object to her neck, forced her to return to the bedroom, where he raped her. H.H. called 9–1–1 after the perpetrator fled the scene. H.H. later described her attacker to the police as African American, slim, soft-spoken, and taller than she. She was unable to identify

him because she had not seen his face. She also could not identify the sharp object he had held to her neck.

H.H. was taken to a Rape Crisis Center where a nurse performed a forensic examination and prepared a sexual assault kit. Vaginal, anal, buccal, and fingernail swabs were taken from H.H., dry secretions were collected from her inner thighs, and slides were prepared from the swabs. Those samples, along with H.H.'s nightgown and underpants, were sent to the State Police Forensic Laboratory (State Lab) for analysis.

Charles Williams, a forensic scientist in the Biochemistry Department of the State Lab, tested the items in the sexual assault kit for the presence of blood and sperm. The vaginal slide tested positive for sperm, the external genital specimen and anal swab tested positive for blood, and the dried secretions from H.H.'s thighs tested positive for both blood and sperm. Those specimens were sent to the DNA Department of the State Lab along with H.H.'s buccal swab.

Shortly after the assault, the police identified as a suspect a person to whom we will refer as E.A. A buccal swab was obtained from him and sent to the State Lab on November 14, 2005.

. . . .

On November 16, 2005, Linnea Schiffner, a forensic scientist with the DNA Department of the State Lab, received the items from H.H.'s sexual assault kit that had tested positive for blood or sperm, as well as the buccal swabs taken from H.H. and E.A. Schiffner performed a differential extraction on each specimen to separate the sperm cells from the skin cells, creating separate "sperm-cell fraction" (SCF) and "non-sperm-cell fraction" (NSCF) samples from each specimen. She then analyzed the buccal swabs and the SCF and NSCF samples from each specimen to generate DNA profiles.

Based on the analysis Schiffner performed, she was able to create a full DNA profile for the individual who had contributed the sperm cells to the specimens taken from H.H., as well as profiles for H.H. and E.A. from their respective buccal swabs. She concluded that E.A.'s DNA profile did not match that of the male contributor to the samples taken from H.H. Schiffner prepared a report, dated December 7, 2005. The report listed the samples that Schiffner had tested, set forth an allele table listing the DNA profiles generated for each sample by the Genetic Analyzer, and stated Schiffner's conclusion that E.A. was excluded as a possible contributor to the

DNA profiles from the sperm cell fractions of the inner thigh samples taken from H.H. Schiffner signed each page of the December 7, 2005, report.

Several weeks after H.H.'s assault, [Petitioner], an African American man who lived in the apartment complex adjacent to H.H.'s, was identified as a suspect. On December 22, 2005, North Brunswick police officers stopped [Petitioner] in the parking lot of his apartment complex and searched him, finding a pair of black gloves, keys, a lighter, a crack pipe, and a small[,] sharpened stick in his pocket. The officers obtained [Petitioner]'s fingerprints and a buccal swab, and sent the buccal swab to the State Lab for analysis.

Because Schiffner had relocated to Wisconsin, the H.H. case file and [Petitioner]'s buccal swab were assigned to Jennifer Banaag, another forensic scientist in the DNA Department, who issued a report dated February 24, 2006. Banaag analyzed the DNA from [Petitioner]'s buccal swab using the lab's standard procedures and generated a full DNA profile for [Petitioner]. Banaag compared the profile she had generated from [Petitioner]'s buccal swab with the profiles generated from the specimens taken from H.H.'s inner thighs, and concluded that, within a reasonable degree of scientific certainty, [Petitioner] was the source of the DNA in the samples taken from H.H. Based on her statistical calculations, Banaag determined that the DNA profile found in those samples occurs in only one in approximately 1.3 quintillion African Americans.

Banaag reviewed Schiffner's report and all the underlying data generated by Schiffner's testing procedures, as well as all files relating to the case. As part of this review, Banaag testified that she checked "everything" from the initials and dates on the pages to the "data calls" made by Schiffner in generating the profiles that she reported. Thus, Banaag's review included reaching her own conclusions as to the correctness of the value called for each locus used in creating the allele table. Essentially, through her review she verified the allele table for the sample that Schiffner had tested. Banaag prepared a signed report containing an allele table with the DNA profile she had generated from [Petitioner]'s buccal swab and the DNA profiles reported by Schiffner for the samples taken from H.H. The report stated Banaag's conclusion that [Petitioner] was the source of the DNA found in the samples taken from H.H. after the assault.

. . . .

At [Petitioner]'s trial [on charges including burglary, criminal restraint, robbery, and sexual assault] before a jury in

3

January 2007, the key issue was identity, which turned on the DNA analysis performed at the State Lab because H.H. could not identify her attacker and no fingerprints had been found at the crime scene.

In respect of the DNA evidence, the State presented the testimony of two expert witnesses: Williams, who had tested the samples from the sexual assault kit for blood and sperm, and Banaag, who had created a DNA profile from [Petitioner]'s buccal swab and compared it to the profiles generated by Schiffner from the samples taken from H.H., which Banaag had verified based on her independent review of that data. The State also presented the testimony of the nurse who had examined H.H. at the sexual assault crisis center and had collected the samples that were sent to the State Lab. Schiffner did not testify.

It is Banaag's testimony that gives rise to [Petitioner]'s claim of a violation of his confrontation rights.

When the State called Banaag, [Petitioner] objected to any testimony by Banaag about the analysis performed by Schiffner. [Petitioner] argued that testimony by Banaag about tests performed by Schiffner was hearsay and violated [Petitioner]'s right to confront the analyst who had performed the tests being used against him. The State argued that Banaag, as an expert, had properly relied on Schiffner's work in performing her own independent analysis, and that [Petitioner] had the opportunity to subpoena Schiffner if he chose to do so. Accepting the State's representation that Schiffner's departure from employment at the State Lab had not been due to a termination for incompetence, the court overruled [Petitioner]'s objection and allowed Banaag's testimony.

. . . .

Banaag began by describing her duties at the State Lab, discussing the lab's accreditation, explaining the basic principles of DNA analysis, and describing the testing methodologies used at the State Lab. Banaag stated that she had followed those standard processes with [Petitioner]'s buccal swab and explained the results of her analysis. She described the profile she generated from [Petitioner]'s DNA sample, stating which values pertained at each of the thirteen loci.

Banaag also identified Schiffner's report when the prosecutor showed it to her, and she discussed the work done by Schiffner. Specifically, Banaag explained which samples Schiffner had tested and how Schiffner had separated the sperm-cell and non-sperm-cell fractions of those samples. Banaag stated, "I [took] the

4

data that I generate[d] from the buccal swab, the DNA profile, and I compared it to any of the profiles that were generated by Miss Schiffner when she did her analysis of the specimens that were received for this case." Banaag testified, "I made [an] independent data analysis for the buccal swab that I received, went back and reviewed Miss Schiffner's case and made my own independent conclusions." Banaag then stated that she had incorporated the DNA profile generated by Schiffner into her report. She explained her comparison of the profiles for the jury, stating in detail the values that she and Schiffner had found at each locus from their respective samples.

Banaag described her review of Schiffner's work as follows:

> I would have taken Miss Schiffner's entire case file and gone through and reviewed every single page in that case. I look for anything from dating and initials and all the pages. I also make sure all of the data calls that she made are correct and that I agree with them and that all of the information that she reported out in her report [is] accurate.

When the prosecutor asked Banaag whether she "agree[d] with [Schiffner's] results," Banaag responded "Yes, I do."

Banaag went on to state her conclusion that "within a reasonable scientific certainty . . . Reginald Roach is identified as the source of the DNA profile obtained from specimens number 1–6–1 SCF and 1–6–2 SCF," the sperm cell fractions of the samples taken from H.H.'s inner thighs. Quantifying that certainty, Banaag stated that, based on her statistical calculations, she had determined that the DNA profile obtained from those samples occurs in approximately one in 1.3 quintillion African Americans.

When asked about the integrity of the samples and testing in this case, Banaag testified that she "didn't see any indication that any of the samples were compromised" because "if you just look at the data generated, the data is consistent with either being from the victim or the suspect. There aren't any indications of there being a third individual in the DNA."

[Petitioner]'s cross-examination of Banaag focused on the procedures used in DNA analysis generally and the possibility of contamination of the sample during the amplification step, as well as Banaag's calculation of the frequency of occurrence of the profile in the African American population and the meaning of the ratio she had calculated. Banaag explained in detail the process by which the

5

profiles are generated from the data produced by the analyzer machine:

> [Banaag:] . . . [T]he data is then generated with the peaks that you saw in that one graph. [The analyzer] will generate peaks [ ] based on the size of the DNA fragments that pass through that window. . . .
>
> [Defense attorney:] With regard to those peaks who determines what numbers to attribute to any of the peaks with regard it will be 12, 13 or, who determines that?
>
> [Banaag:] Every run that we put through the 3100s, every run that's put on the genetic analysis has an al[l]ele like ladder that runs with it. . . . The ladder is run with every single 3100 run that we put on and the ladder is sized and all of the samples that are run through on that run are sized compared to the ladder.
>
> [Defense attorney:] Who does it?
>
> [Banaag:] When we pull off the data from the instrument we examine the ladder to make sure all the peaks are labeled correctly and in doing that we then look at the data that is generated for each of the samples. That automatically calls all of the peaks in each of the samples as compared to the ladder so we do make sure the ladder is called correctly and we look at the data that's generated for the samples in comparison to the ladder.
>
> [Defense attorney:] The computer is the one that analyzes everything and spits it out for you?
>
> [Banaag:] Basically it extrapolates the sizes of the ladder and extrapolates the sizes of the base calls for each of the samples so we do get a printout with those peaks on it. The al[l]ele calls are already labeled and that's what we use to analyze our data. Those are the peak heights and peak calls that we use in our reports.
>
> [Defense attorney:] If the computer is wrong, can you fix it?
>
> [Banaag:] Wrong in what sense?

> [Defense attorney:] You say you're verifying the al[l]ele calls, is that correct?
>
> [Banaag:] That's correct.
>
> [Defense attorney:] So if the computer isn't wrong what is there to verify?
>
> [Banaag:] Well, the only way we would be able to tell if there was anything wrong is if there's something unusual with the ladder. That's kind of the standard that we're measuring all the samples by at this point. If the ladders are correct we assume that the calls that are made for each of the samples is correct also and we do performance checks on our instruments. We have records of those performance checks.
>
> Defense counsel did not ask Banaag any questions relating to the specific details of how she conducted the tests on [Petitioner]'s buccal swab or any errors she might have made while doing so.
>
> [Petitioner] chose not to testify on his own behalf and he called no witnesses.
>
> Following an eight-day trial, the jury found [Petitioner] guilty of second-degree burglary, two counts of first-degree aggravated sexual assault, second-degree sexual assault, and third-degree possession of a weapon for an unlawful purpose. [Petitioner] was sentenced to an aggregate forty-year prison term with an eighty-five percent parole disqualifier under the No Early Release Act[.]

*State v. Roach*, 219 N.J. 58, 61-69 (2014), *cert. denied*, 575 U.S. 1028 (2015).

## II.    LEGAL STANDARD

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*,

7

712 F.3d 837, 846-47 (3d Cir. 2013). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta[,]" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a state court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### III. <u>DISCUSSION</u>

#### A. **Petitioner's Confrontation Clause claim**

In his first claim, Petitioner contends that he was wrongfully denied the opportunity to confront one of the witnesses against him as the state's DNA expert was permitted to testify both to her own efforts in identifying the samples involved in this matter and a DNA profile, which she

8

reviewed and reevaluated, drafted by a coworker who had left her office. Pursuant to the Confrontation Clause of the Sixth Amendment, a criminal defendant has the right to confront the witnesses against him, which includes a right to have the testimonial hearsay statements of witnesses absent from trial admitted only where the declarant is unavailable, and the defendant had a previous opportunity to cross-examine them. *See Williams v. Illinois*, 567 U.S. 50, 64-65 (2012). In *Williams*, the Supreme Court concluded that testimony from one laboratory technician regarding a DNA profile produced by an outside laboratory from samples taken from a rape victim matched the DNA of the defendant, without a representative from the outside lab testifying, did not violate the Confrontation Clause. *See United States v. James*, 712 F.3d 79, 91 (2d Cir. 2013). Although five justices agreed that such an admission was not a violation of the Confrontation Clause, they reached this determination in the form of a four-justice plurality accompanied by a concurrence in the judgment that disagreed with that plurality's reasoning in its entirety. *Id.* at 91-93. Because this background renders the *Williams* case of unclear precedential value, Courts generally apply pre-*Williams* caselaw in determining the admissibility of such evidence. *Id.* at 94-95; *see also United States v. Walker*, 990 F.3d 316, 322 n. 8 (3d Cir. 2021). That pre-*Williams* caselaw strongly suggests that, where a testifying expert reviews and re-evaluates work performed by another and uses that evaluation and her own efforts to reach a scientific conclusion and thus has some direct involvement in the forensic testing at issue, the Confrontation Clause will be satisfied where the defendant has the opportunity to cross-examine the reviewing expert. *See Walker*, 990 F.3d at 322-23 (collecting cases).

In deciding Petitioner's claims, the New Jersey Supreme Court took exactly this approach, and applied the pre-*Williams* cases to conclude that Petitioner's rights were not violated by the testimony of the State's DNA expert as that expert "carefully reviewed and analyzed all the underlying machine-generated [DNA] data and formed her own conclusions about the results to

which she testified" *Roach*, 219 N.J. at 75-83. The expert did not merely parrot the work of the other analyst involved in preparing some of the DNA evidence evaluated at trial. *See id.* at 75-83. Because applicable federal law, up to and including *Williams* strongly suggests that the opportunity to cross-examine a reviewing expert who re-evaluates scientific data to reach an ultimate conclusion after initial work done by a different analyst is sufficient to satisfy the Confrontation Clause, these conclusions made by the New Jersey Supreme Court were neither contrary to, nor an unreasonable application of, applicable federal law. *Walker*, 990 F.3d at 322-23. As the New Jersey Supreme Court's decisions were neither contrary to nor an unreasonable application of Supreme Court precedent, Petitioner cannot show an entitlement to habeas relief on this claim. *Woods*, 575 U.S. at 316 (only objectively unreasonable misapplications of federal law will warrant habeas relief, even clear error is insufficient).

**B.      Petitioner's Ineffective Assistance Claims**

In his two remaining claims, Petitioner contends that he received ineffective assistance of counsel as counsel failed to obtain a DNA expert witness and he believes counsel was inadequately prepared for trial and thus failed to put the state's proofs to the test. The standard applicable to claims of ineffective assistance of counsel is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

Petitioner first asserts that his trial counsel proved ineffective in failing to obtain a DNA expert to testify at trial. On appeal from denial of Petitioner's PCR petition, the Appellate Division rejected this claim, finding that counsel had clearly testified that he had sought an expert, but found those available to be unhelpful, and that Petitioner had in any event failed to proffer any proposed testimony from an available expert as to what testimony could have been provided, which was

11

fatal to any attempt to show *Strickland* prejudice. (*See* ECF No. 17-42 at 17-18.) That holding was neither contrary to nor an unreasonable application of federal law. It is axiomatic that a petitioner's "failure to include a sworn statement regarding the nature of [an expert's] proposed testimony is fatal to his making a *prima facie* showing of prejudice" as to the failure to call such an expert at trial. *Tolentino v. United States*, No. 13-4168, 2014 WL 3844807, at *3 (D.N.J. July 31, 2014); *see also Duncan v. Morton*, 256 F.3d 189, 201-02 (3d Cir. 2001). As Petitioner has identified no expert who was willing to provide testimony in support of his claims, he has failed to show any prejudice flowing from counsel's alleged failure to call such a witness, and his first ineffective assistance claim therefore fails to set forth a valid basis for habeas relief.

In his final claim, Petitioner contends that his trial counsel inadequately prepared for trial and thus failed to put the state's case properly to the test. As one court in this District has explained,

> [i]n *Strickland*, the Supreme Court held that trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. "The failure to investigate a critical source of potentially exculpatory evidence may present a case of constitutionally defective representation," and "the failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness." *United States v. Travillion*, 759 F.3d 281, 293 n.23 (3d Cir. 2014) (internal quotations omitted); *see also United States v Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (noting that a complete absence of investigation usually amounts to ineffective assistance because a counsel cannot be said to have made an informed, strategic decision not to investigate); *United States v. Baynes*, 622 F.2d 66, 69 (3d Cir. 1980).
>
> Where a Petitioner can show that counsel's failure to investigate amounts to deficient performance, he must still show prejudice. In order to do so,

> a defendant basing an inadequate assistance claim on his or her counsel's failure to investigate must make "a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming admissibility in court, would have produce[d] a different result.
>
> *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (quoting *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987)); *see also United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011) ("[w]hen a petitioner alleges that counsel's failure to investigate resulted in ineffective assistance, the petitioner has the burden of providing the court with specific information as to what the investigation would have produced"); *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome" of Petitioner's case); *accord Untied States v. Garvin*, 270 F. App'x 141, 144 (3d Cir. 2008).

*Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *4-5 (D.N.J. May 2, 2016).

On appeal from the denial of Petitioner's PCR, the Appellate Division rejected Petitioner's claim of inadequate preparation and investigation, noting that while counsel made certain hyperbolic claims regarding how much time he needed to prepare in relation to DNA evidence as part of an attempt to obtain a continuance prior to trial, counsel's actions at trial clearly indicated he understood the relevant DNA data, that he was amply prepared to cross-examine and challenge the DNA evidence, and that counsel was prepared to make timely challenges – including the Confrontation Clause challenge raised above – where necessary. (ECF No. 17-42 at 15-17.) Having reviewed the record of this matter, it is clear that these conclusions are well supported by the trial documents. Counsel was clearly well prepared at trial, and raised cogent, thoughtful arguments against the DNA evidence during his statements to the jury, while ably challenging the DNA expert – who provided the linchpin connecting Petitioner to the crime – through a thorough cross-examination. It fully appears that counsel was ready and able to defend Petitioner at trial,

13

and Petitioner's contention that counsel failed to adequately prepare or investigate his case is utterly meritless. In any event, Petitioner has failed to make any comprehensive showing of what additional defenses would have arisen with "more thorough" preparation, nor any specific arena in which counsel's performance truly fell short. As he has therefore failed to show that counsel was either deficient or prejudiced his defense, Petitioner's claim is without merit. As all of Petitioner's claims fail to set forth a valid basis for habeas relief, Petitioner's habeas petition is denied.

## IV.  **CERTIFICATE OF APPEALABILITY**

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "[A petitioner] satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude [that] the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because Petitioner's habeas claims are all without merit for the reasons set forth above, he has failed to make a substantial showing of a denial of a constitutional right, and his petition is not adequate to receive encouragement to proceed further. This Court therefore denies Petitioner a certificate of appealability.

## V. **CONCLUSION**

In conclusion, Petitioner's habeas petition (ECF No. 1) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability. An appropriate order follows.

*/s/ Michael A. Shipp*
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**